No. 37,324

G. K. Burton, *Appellant,* v. F. S. Ostertag, J. M. Dunn, Ethel Ostertag, Irene Ostertag, operating and doing business as the Wichita Distributing Company, a copartnership, *Appellees.*

(201 P. 2d 676)

Opinion filed January 22, 1949.

*Vincent F. Hiebsch,* of Wichita, argued the cause, and *Milton Zacharias, Eugene L. Pirtle, Kenneth H. Hiebsch* and *George Adams,* all of Wichita, were with him on the briefs for the appellant.

*Arthur W. Skaer* and *William Tinker,* both of Wichita, argued the cause, and *Getto McDonald* and *Hugh P. Quinn,* both of Wichita, were with him on the briefs for the appellees.

The opinion of the court was delivered by

HARVEY, C. J.: This was an action for a balance alleged to be due for services under a written contract. The plaintiff has appealed from an adverse decision of the trial court. In the petition, filed December 18, 1946, plaintiff gave his address as Wichita and alleged the defendants are partners doing business at Wichita as the Wichita Distributing Company engaged in the wholesale distribution of beer and equipment for beer parlors in Sedgwick and adjoining counties; that the Dunn-Ostertag Packing Company is a corporation doing business at Wichita; that on July 1, 1936, he entered into a written contract with the defendants by which plaintiff was employed in the promotion of sales, transportation and general advancement of the wholesale beer distributing business, for which he was to receive fifty percent of the net profits of the business as consideration for his services, the defendants to furnish the necessary equipment, storage facilities, office space, etc., and keep the necessary stock on hand; that pursuant to the contract plaintiff immediately entered upon his duties and devoted his entire time and efforts to the business until September 1, 1946, when he severed his connection with defendants, with their consent, at which time plaintiff demanded a final audit of the books of the defendants and of the Dunn-Ostertag Packing Company; that defendants promised him such an audit, but that the same was not furnished; that the defendants appropriated funds and deposited the same with the Dunn-Ostertag Packing Company, which funds were used by the corporation in carrying on its business; that the corporation and defendants kept a joint set of books. There were allegations as to specific funds used by the defendants and the corporation in such a way that plaintiff did not receive his full share, which need not be

detailed. That on November 2, 1946, defendants delivered to plaintiff their check in the sum of $807.13, which plaintiff alleged was much less than was due him, and he tendered the check into court to apply upon the amount found due plaintiff. Plaintiff further alleged that he believes there is now due him a sum in excess of $25,000 as his share of the profits. He prayed for judgment in that sum, or any excess the court found due him; that the court order an audit to be made of the books of defendants and of the corporation insofar as it pertained to the business of defendants; that defendants be restrained from disposing of or encumbering any of the property acquired from moneys deriving from the earnings of the Wichita Distributing Company during the term of his contract; that a receiver be appointed to ascertain the value and location of the property, and that the judgment of the court be declared a lien upon the properties of defendants and of the corporation, and for such other and further relief as the court deemed equitable and just in the premises. A copy of the contract sued upon was attached to the petition and reads as follows:

"WICHITA, KANSAS
7-1-1936

#### EMPLOYMENT AGREEMENT

"This employment agreement entered into by and between The Wichita Distributing Company and G. K. Burton, for the purpose of promoting the sale of Storz and Pointer Beers, and any other brands which the Wichita Distributing Company may acquire.

"G. K. Burton agrees to devote his entire time to the promotion of the sales, transportation and general advancement of the business. For this, G. K. Burton shall receive one half (50 per cent) of the net profits derived therefrom.

"The Wichita Distributing Company agrees to furnish necessary equipment, storage facilities, office space, etc., and keep the necessary stock on hand.

"It is further mutually agreed that G. K. Burton will be allowed a drawing account of $25.00 per week, which amount shall be charged to G. K. Burton until the end of the current month, at which time same shall be deducted from G. K. Burton's share of the net profits, or paid by G. K. Burton to the Wichita Distributing Company.

"G. K. Burton further agrees to furnish the Wichita Distributing Company a Bond of Security, satisfactory to the Wichita Distributing Company during the life of or effective date of this agreement which shall be from July 1st, 1936, forward as long as same is mutually agreeable to both parties.

"Employer, The Wichita Distr. Co.
by F. S. Ostertag,
"Employee, G. K. Burton."

A copy of the check alleged to have been tendered plaintiff on November 2, 1946, was attached to the petition. It bore date of October 2, 1946, and had written on its face, "This is final settlement and payment in full." Also attached to the petition as Exhibit "C" was a copy of a letter, dated November 21, 1947 [6] from plaintiff's counsel to counsel for defendants, demanding an audit of defendants' books, or to permit plaintiff to make such an audit within ten days.

To this petition defendants filed a motion for an order requiring plaintiff to make the petition definite and certain in eight specific particulars. Before that motion was ruled upon by the court plaintiff filed an amended petition apparently complying with many of the requests made in the motion, but otherwise being of the same tenor and having the same prayer as the original petition. To the amended petition defendants filed a demurrer upon the ground, among others, of misjoinder of parties defendant. The demurrer was sustained upon that ground. Plaintiff then filed his second amended petition, omitting all allegations in the earlier petitions respecting the Dunn-Ostertag Packing Company, a corporation. It alleged the individuals named as defendants were partners in the making of the contract of July 1, 1936, and his services under it, until its termination on September 1, 1946; alleged that on November 2, 1946, the defendants had mailed him a check for $807.13, which he had refused to accept and tendered into court; and that about September 1, 1946, he had an oral agreement with defendants that they would furnish him a complete audit of the books, showing the purchases and sales of the cereal malts and of property purchased by the defendants and the disposition thereof, but such an audit was not furnished him. He alleged the amount of gross sales and what he alleged to be the net profit for his entire term of service and the amount that had been paid him, and alleged there was a balance due of $190,809.80, for which sum, with interest, he prayed judgment with costs and such other and further relief as the court deemed proper. Defendants filed an answer to this second amended petition in which they admitted the residence of plaintiff, the fact that defendants were partners, the execution of the written agreement of July 1, 1936; that plaintiff severed his connection with defendants on September 1, 1946; that a demand for an accounting was made upon them on November 21, 1946, and denied generally and specifically all of the other allegations of plaintiff's petition;

and alleged that during the time of plaintiff's employment with defendants most of the items of expense chargeable against the operation of the business were furnished by the plaintiff; that ledgers were kept and balances struck each month, with detailed items of expense; that all items of expense chargeable against the gross profits were furnished to and seen by and understood by plaintiff; that during all that time plaintiff was credited on the books of defendants with one-half the net profits, and that plaintiff received in payment one-half of the net profits of the business, except the sum of $807.13, which was paid to plaintiff in final settlement on October 2, 1946, and that upon such payment being made plaintiff had received an undivided one-half of the net profits of the business during his employment with defendants. It was further alleged that during all of the time of the operation of the parties under the contract referred to plaintiff had full knowledge of all items of expense charged against the gross profits of defendants, and that he acquiesced in such charges and approved the amount of net income each month from the operation of defendants, and that he is now estopped to claim that any of the items of expense were not chargeable against the gross profits of defendants. The prayer was that plaintiff take nothing in this action and that defendants recover their costs. To this answer plaintiff filed a reply, which was a general denial, and also filed the following motion:

"MOTION FOR APPOINTMENT OF AN IMPARTIAL ACCOUNTANT

"Comes now the plaintiff and shows to this court that this action involves a long and complicated accounting to determine the interests of the parties.

"Wherefore the plaintiff prays that the court appoint an impartial accountant to audit the books of the defendants involved in this action, the expenses thereof to be charged as costs in the case, said accountant to report to the court the results of his accounting."

This motion came on for hearing before the court. The plaintiff, called as a witness in his own behalf, testified in substance as follows: That after the making of the contract on July 1, 1936—

"I took charge of the beer distributing business for the defendants and assumed all of the duties that went along with the management of the wholesale beer business, but the office and records were kept by the office of the Ostertag Packing Company. All checks for the payment of bills were written by Dunn and Ostertag. As the business increased, it was necessary that we have more room and another building was built in 1941. Mr. Dunn said the cost of this building was set up against the beer business. I inquired about the cost but I never did find out. We used motor trucks and horses and the expense of purchase of the trucks was charged against the business. I called the

defendants' attention to my employment contract in which they were supposed to furnish such equipment. Office expenses were charged against the distributing company and the summary of these expenses was contained on the monthly trial balance. Traveling expenses were not broken down but just given in a lump sum. I never did get any detailed figures. I asked for details on these expense items but I didn't understand the bookkeeping system as I am not a bookkeeper. . . . During the time of my employment, I drew certain amounts and at no time did they tell me that they paid me the full amounts which was due. It was understood until the final check that it was not the final settlement. During the time that some of the business was carried on a charge account basis, they set up a reserve fund and they would take so much at different times along some time of every month in a reserve accounts receivable. There was never any account showing these charge accounts were credited back or whether I was paid the full amount collected. In my opinion, the amount of charge accounts uncollected ran always less than one percent. I asked them for an audit but no final settlement was made. There is a substantial amount still due me in my opinion. . . . I never had any information as to whether the amount of insurance charged up was paid on the business or might have been paid for some other insurance. I never saw the statements on it. There was no way I could ascertain what was a direct charge against the business. I did not know in detail what they were charging up as a total operating expense against the company. When for example there was an item of travel expense, I was not furnished a detailed statement as to what the travel was for. I do not know whether it was done for the beer business or not. That would be true of a great many items which were read to me in a lump sum. . . . Whenever the items of office expense appears in detail, I objected in that the contract provided that the defendants were to furnish office expense."

Upon cross-examination Mr. Porter, counsel for defendants, confronted witness with a bound volume of defendants' monthly and yearly trial balance sheets and profit and loss statements, which ran in sequence through the entire period of plaintiff's employment, The witness was asked and answered the following questions:

"Q. Mr. Burton, you are familiar with this document I have here, are you not, what do you call them? A. Monthly trial balance sheet.

"Q. And at the close of each month that kind of statement was fixed up and placed in there? Right straight through, was it not? A. Yes, sir.

"Q. Where was that book kept? A. It was kept in the safe.

"Q. And any time you wanted to see it you could go to the safe, couldn't you, unless it was already out? A. That is right.

"Q. And you saw that each and every month, so far as you know, did you not? A. Yes, I could tell I understood the trial balance for that one month.

"Q. As far as you know, every month? A. Yes, every month.

"Q. And each and every month you saw the items which they had charged up as expense or bills used in the business of the Wichita Distributing Company? A. Yes, I saw them.

"Q. Now, let me read you down here the various items. This is December 1944. Insurance $613.23. You knew that was charged up? A. Yes.

"Q. Wagon $5.83, you knew that was charged up. A. Yes.

"Q. Accounts due banks, $964.11, you knew at that time that was charged up? A. Yes.

"Q. Licenses and permits, $22.00, you knew that was charged up? A. Yes.

"Q. The manner in which they kept the books see if this is not correct, they would take the licenses and permits and other things like that and they would divide it up into 12 equal payments and charge one-twelfth to each month? A. Yes.

"Q. That is correct, you knew that? A. Yes.

"Q. And here is license and mileage, $64.18, that is down as expense? A. They varied every month.

"Q. But you knew that? A. Yes.

"Q. What is S. S. Tax money. A. Social Security.

"Q. Then you knew in December there was $14.42 charged up as expense on that? A. Yes.

"Q. And U. S. Compensation tax, $28.84, you knew that in December, 1944? A. Yes.

"Q. Stationery charge for that month, $7.99, you knew that as an expense? A. I see it there, I did not see the bill on it.

"Q. But you knew in December 1944, that was charged as a stationery expense? A. Yes.

"Q. And here is a charge in December 1944 of gas $34.33? A. Yes.

"Q. And sales expenses $79.11? A. Yes, Sir.

"Q. Traveling expenses, $319.96, you knew that was charged up as expense? A. I knew it was charged up as expense.

"Q. Local expenses, $100, you knew that was charged up? A. I see it there but I didn't know what it was spent for.

"Q. Advertising $10, you knew that was charged? A. Yes, sir.

"Q. And garage expenses of $102.49? A. Yes.

"Q. You knew that was charged? A. Yes.

"Q. Telephone, $48.24, you knew that was charged? A. Yes.

"Q. Dues and subscriptions, $175? You knew that was charged up? A. I knew it was charged up.

"Q. And rent, $20, you knew that was charged up on the books as an expense of the Wichita Distributing Company in the operation of the beer business? A. Yes.

"Q. Payroll, $1,441.29, you knew that was charged up as expense. A. Yes, sir.

"Q. On each one of these monthly closing statements, in addition to the amounts I have read relative to those items, there was also shown the total expenses paid and charged against the Wichita Distributing Company relative to those items for the whole year, wasn't there, in this first column? A. Yes, in the first column.

"Q. The second column was the expenses of the month? A. Yes.

"Q. The third column was that the total of both of them? A. All I understand this to be—

"Q. Well, add those to that and it makes the third column? A. I will add them up. Yes, when you add them up.

"Q. Then isn't this true, in December of 1944 you knew of the exact total of all the charges that had been made by the Dunn-Ostertag Packing Company against the operation of the beer business relative to each one of those items of expense for the whole year, didn't you? A. I knew about the items that was charged although I wasn't in accord with them.

"Q. You knew they was charged? A. On that sheet there, yes.

"Q. And you knew when the sheet showed your half as being $800, you knew you were credited on the books for $800? A. Yes, sir.

"Q. Now during this time you never drew any set salary? A. I never did.

"Q. When you needed some money you went in and got a check for it, is that correct? A. Yes. It would be deducted against my credit balance. If I had any credit balance.

"Q. And Mr. Dunn went and showed you on the books how much you had coming, didn't he? A. He done that numerous times credits and debits and might have this one time.

"Q. You have seen the ledger many a time to see how much you had coming? A. I knew what I was charged with and debited with.

"Q. And all those figures I have just now read to you were on there weren't they? A. I can't testify that they were, I don't know they were until I check my records.

"Q. What records do you have? A. I have a record.

"Q. Produce them, will you? A. I haven't got them here.

"Q. Do you have a record of how much you received during this 10 years? A. Not a quite complete record.

"Q. Now, Mr. Burton, I refer here to the sheet at the closing of the 30th of December 1944, each month you had a sheet just like that, didn't you? A. Yes, sir.

"Q. And the last month of each year you had a sheet similar to this. A. Yes, sir.

"Q. So, at the end of each month you knew from examining these reports every penny that was charged up against the operation of the beer business of the Wichita Distributing Company on these books, that is correct, isn't it? A. Yes, sir.

"Q. And this record that I have been referring to here shows during those 10 years a net profit of $144,741.60, isn't that correct? A. I can't verify that because I never figured that up.

"Q. Did you ever figure it at any time. A. I kept track of it for my own benefit.

"Q. You kept track each year, did you, or each month? A. The month and the year on the income tax, I kept track on that.

"Q. Then, in addition to this book I have referred to here showing the closing out each month you also kept additional records yourself taken from this, did you not? A. Not necessarily off that record there.

"Q. Where do you have that? A. I didn't copy it off of that record.

"Q. Where do you have your records? A. Oh, I have got part of them at the house and the amount I drew each month and each year.

"Q. Well, you also had a record, didn't you keep a record of what you had coming to you? A. I could always turn back to that trial balance, I could turn back and look at them.

"Q. But you saw the pages making up this record? A. That is right.

"Q. And you saw them every month? A. That is right.

"Q. And every month you knew exactly what they was charging up as expense of the beer business of the Wichita Distributing Company? A. I knew what the expense items were on there.

"Q. You knew they were charged up as items of expense each month during the 10 years. A. Yes, I knew the accounts.

"Q. And what it was for, you knew that? A. Yes, I knew in substance, I expect.

"Q. You, during the time this contract was in operation, took several trips back to various breweries, didn't you? A. Yes.

"Q. Each time you went you charged it to your expenses? A. Yes.

"Q. And turned it in? A. Yes.

"Q. As a matter of fact, during all this time most of these traveling expenses is yours, isn't it? A. A part of the time it was.

"Q. And who fixed up the payroll items? A. Dunn and I worked on them if a new man was hired I would say; put him on.

"Q. Then you and Dunn would go over the payroll items to see if they were correct? A. Yes.

"Q. As a matter of fact, you and Dunn went over these items every month, didn't you? A. Not every month."

At the close of the examination of plaintiff as a witness the following occurred:

"The Court: Call your next.

"Mr. Porter: If your honor please, I don't know of any reason why we should prolong this.

"Under the testimony of the plaintiff, himself, he is not entitled to an accounting as a matter of law and I would like an opportunity to present a brief within the next week or something like that.

"Assuming everything he said was true, he is absolutely barred from an accounting. The Supreme Court of Kansas has held that and I would like to stop right here and present a brief, no use of taking up the time of the Court.

"The Court: You want to demur to his evidence?

"Mr. Porter: Well, it is evidence on a motion. I presume I should demur to it because it does not show facts sufficient to entitle him to an accounting.

"The Court: Mr. Hiebsch, what do you say?

"Mr. Hiebsch: I don't get his theory. I think it does show a long account here and certain items were charged against him and he protested and he says he was never paid in full and he figured all the time they would have a final accounting and he demanded one and when he quit he asked for it and I think he is entitled to an accounting.

"The Court: Well, if you want to present a brief I will let you do that."

The court fixed a time for the filing of briefs. And thereafter the court rendered its decision as follows:

"Thereafter, on this 26th day of March, 1948, this matter comes on regularly for hearing after the parties hereto have submitted their briefs, and the court after being fully advised in the premises, finds that the demurrer of the defendants to the evidence of the plaintiff be and is hereby sustained, it is therefore hereby

"Ordered that under the evidence introduced by the plaintiff, the plaintiff is not entitled to an accounting against the defendants, and the demurrer of the defendants to the evidence introduced by the plaintiff be and is hereby sustained, all at the costs of the plaintiff herein."

Notice of appeal from the judgment of the court of March 26, 1948, was timely served and filed.

In this court the appellant states the following as the legal questions involved.

"I. In an action on an employment contract wherein plaintiff-appellant-employee seeks to recover compensation due thereunder and prior to the trial thereof, appellant files a motion for the appointment of an impartial accountant to simplify presentation of proof to the jury, does the action of the trial court in sustaining a demurrer of defendant-appellee-employer to appellant's evidence adduced in support of his motion, bar appellant from a trial of his cause on the merits thereof?

"II. Is it error to deprive appellant of a jury trial in a simple action upon a contract by a ruling of the trial court that incomplete evidence introduced in support of a motion seeking employment of an impartial accountant bars appellant from an accounting when an accounting per se does not constitute the relief sought in appellant's petition?"

As to the first question submitted to us, it is elemental that one who desires an accounting or the appointment of an accountant in a case must show, either in his pleadings or upon his application for the accounting, that he has a case in which such an accounting as he desires would be proper. Here the plaintiff disclosed by his own testimony that there had been an accounting each month and each year during the more than ten years of his employment. It is true he stated that he did not fully understand some of the items. As to those items, there is no showing that he attempted to get additional information. There is no direct charge of fraud or concealment. His testimony makes it clear that he not only had access to the books but that he actually saw them and went over them with Mr. Dunn; that he knew exactly what the charges were and that the net profits had been computed for each month; that he was given credit upon the books for one-half thereof, and that he drew upon those credits when he wanted to do so. The monthly statements of the business done, the expenses, and the net profit and the amount due plaintiff, in legal effect constituted an account

stated. So far as it appears from his own testimony he made no complaint about the amount that the account showed he was entitled to for each month. We think the court was justified in holding, under his own testimony, not only that he had failed to make a case in which he was entitled to have any further accounting or to have an accountant appointed, but had in effect established the very defense which the defendants had pleaded.

As to the second question appellant presents for our decision, we are unable to see any basis in the record for stating it. Plaintiff did not at any time ask for a jury trial, and there is nothing to indicate in the record that the court denied any such a request, if one was made. We see no reason, also, to state the ruling of the court was upon "incomplete" evidence. The record indicates that the plaintiff introduced all the evidence he wanted to introduce. After the plaintiff had testified and counsel on both sides stated that was all, the court announced, "Call your next." If plaintiff had any additional evidence to offer he had an invitation at that time to present it. Plaintiff is not in position to contend in this court that he had other evidence which he desired to offer and the court refused to permit him to do so. The record does not sustain that view.

Appellant cites but two cases, *Williams v. Herring*, 183 Ia. 127, 165 N. W. 342, and *Freeman v. Miller*, 142 N. Y. Supp. 797, which hold that under a contract such as the one before us the relation of the contracting parties is not that of partners but of employer and employee. That accords with our view. In fact the parties to the contract before us so designated themselves. The cases are also authority for the view that the proper form of action for the employee, if he thinks he has not received full compensation provided in the contract, is not one to dissolve a partnership and for an accounting. That may be conceded, although a reading of the relief plaintiff thought he was entitled to, as stated in the petition and the amended petition, appears not to be in accord with that view. Interpreted most favorably to the plaintiff his amended petition was framed upon the theory approved by the above authorities, but in so framing it perhaps plaintiff interpreted the words "net profit" in the contract to be tantamount to "gross profits." But we pass that thought.

Appellant complains that the court made a ruling the effect of which is to deny him recovery upon the hearing of evidence upon

the motion. It sometimes happens that the hearing of a motion in a case may result in a ruling which disposes of the principal controversy, or that would be *res judicata* upon any further hearing upon the principal controversy. (See *Comm'rs of Wilson Co. v. McIntosh,* 30 Kan. 234, 1 Pac. 572, and *State v. Montague,* 138 Kan. 696, 700, 701, 27 P. 2d 222, and authorities there cited.) We think that rule applicable here. The court would not be justified in appointing an accountant unless plaintiff was entitled to recover something based upon the result of the accounting. Therefore the question really is, did plaintiff's evidence tend to show that plaintiff is entitled to an accounting to determine the net profits of the business? We agree with the trial court that it does not. It is quite well settled in this court (*Durham v. C. C. & M. Co.,* 22 Kan. 232; *Belknap v. Sleeth,* 77 Kan. 164, 167, 93 Pac. 580; *Bell v. Johnson,* 142 Kan. 360, 46 P. 2d 886; *Hefling v. City of Sharon,* 152 Kan. 512, 517, 106 P. 2d '680), as well as generally elsewhere (see cases annotated in 80 A. L. R. 624 *et seq.*), that when a party to an action gives testimony the effect of which is to defeat his claim and establish a valid defense relied upon by his opponent, he is bound by such testimony and cannot recover. We think that is what the plaintiff did in this case. The contract between the parties contemplated monthly settlements of sums drawn by plaintiff and of net profits. Plaintiff's evidence discloses that such settlements were made each month; that he knew of them, went over them with one or more of the defendants, accepted and used the profits shown by these settlements, was given copies of the monthly and yearly statements made, and that he agreed with most of the items shown by the statements to be deducted from gross profits and that he made no effective objections to any of them. Each of the statements constituted an account stated. (See *Schmoker v. Miller,* 89 Kan. 594, 132 Pac. 158; *Harrison v. Henderson,* 67 Kan. 202, 72 Pac. 878; *Dettmer v. Fulls,* 122 Kan. 98, 251 Pac. 396; *Reed v. Thomas,* 134 Kan. 849, 8 P. 2d 379; *McKnab-Bess Oil Co. v. Commonwealth O. & G. Co.,* 142 Kan. 739, 746, 52 P. 2d 363; *Smith v. Derby Oil Co.,* 147 Kan. 300, 305, 76 P. 2d 846.) The substance of the direct examination is his statement, "There is a substantial amount still due me in my opinion." Certainly, the generalization in his testimony of the matters which were not fully explained to him, and his general opinion that there should be more due him, form no substantial basis for his repudia-

tion of the many settlements which he assisted in making and in which he acquiesced.

We find no error in the record. The judgment of the court below is affirmed.